ELWERT et al., Appellants,

v.

PILOT LIFE INSURANCE COMPANY et al., Appellees.

[Cite as *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529.]

Court of Appeals of Ohio,
Hamilton County.

No. C-900473.

Decided Oct. 2, 1991.

530

532

*H. Fred Hoefle* and *Kenneth J. Koenig,* for appellants.

*Porter, Wright, Morris & Arthur* and *Mark E. Elsener; Fisher & Phillips, Mairen C. Kelly* and *Richard Stange,* for appellees.

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Hamilton County Court of Common Pleas, the assignments of error, the briefs and the arguments of counsel.

Plaintiffs Otto and Janet Elwert appeal from the trial court's grant of summary judgment to defendant Pilot Life Life Insurance Company ("Pilot Life"), which employed Otto Elwert first as a life insurance agent and later as a broker, and to defendants Billy Luttrell, Donald Ferris and Michael Aiken, who were also employed as agents by Pilot Life. The Elwerts[1] raise five assignments of error, all of which concern the entry of summary judgment. The assignments are premised on separate theories that genuine issues of material fact precluded summary judgment on their claims for (1) tortious interference with Otto Elwert's business relationships, (2) libel per se, (3) slander per se, (4) violation of statutes governing unfair trade practices, and (5) punitive damages and attorney fees based on their first three claims. Because we hold that genuine issues of material fact should have precluded the entry of judgment as a matter of law with respect to the first and fifth claims asserted against Pilot Life, we reverse the judgment of the trial court in part and remand the cause for further proceedings.

Otto Elwert began selling life insurance in 1963 under a career agent's contract with Pilot Life. The contract required Elwert to submit all insurance

---

1. Because Janet Elwert's claim is entirely dependent on that of her husband, reference will be made to the plaintiffs in the singular for the remainder of this decision.

applications he received to Pilot Life. Elwert earned commissions on sales of Pilot Life insurance policies based on a percentage of the initial first-year premium paid by the policy holder ("first-year commissions"), subsequent renewals of the policy ("renewal commissions") and service fees. The contract specifically provided for termination as follows:

"SECTION IV. TERMINATION OF CONTRACT

"A. This Contract may be terminated by either party at any time upon written notice to the other.

"B. In event of such termination, all further right to life commissions and service fees, other than deferred first year life commissions shall cease if:

"1. This Contract is terminated within three years from its date, or

"2. The Company terminates this Contract at any time on account of the withholding by the Agent of money belonging to the Company, or on account of rebating, twisting, or any fraudulent or dishonest act.

"C. Termination of this Contract after three full years continuous service hereunder, (except for violation of his obligations) vests the earned life renewal commissions in the Agent, less a collection fee of 1% of each premium, except that:

"1. If the Agent within twelve months from the termination of this Contract for any cause whatsoever enters the service of any other life insurance company to work in any territory where he had solicited under this Contract, the renewal commissions otherwise payable after the date of such connection shall be reduced one-half, or

"2. If this Contract is terminated for any reason and the Agent then or later endeavors to persuade any Agent to terminate his service with the Company, or to solicit business for another company, or shall attempt to induce a policy-holder to relinquish a policy or policies in the Company, the Agent shall forfeit any interest in renewal or other commissions he might otherwise be entitled to under this or previous contracts."

In August 1982, Elwert's agency contract with Pilot Life was terminated, and on September 1, 1982, the parties entered into a broker's contract that authorized Elwert to solicit applications not only for Pilot Life but also for other insurers. Elwert earned first-year and renewal commissions in the same manner provided by the agency contract. The broker's contract also contained similar provisions requiring written notice of termination and the forfeiture of renewal commissions in the event of termination for fraudulent or dishonest acts.

Shortly after the termination of Elwert's agency contract, Pilot Life closed its Cincinnati agency. Pilot Life opened a new office in Cincinnati one year

later and hired defendant Billy Luttrell as a general agent in charge of the office and defendants Michael Aiken and Donald Ferris as sales agents. As part of its effort to establish the new agency, Pilot Life's regional vice president for the area, Howell DeBerry, told Aiken and Ferris either that Elwert was "no longer affiliated with" Pilot Life or "no longer with" Pilot Life and instructed them to contact a list of policyholders previously enrolled by Elwert while he was an agent. Aiken and Ferris sent form letters to approximately one hundred policyholders informing them of the new Pilot Life office address and stating, in one version dated March 28, 1984, that "[t]he agent from whom you purchased your contract is no longer affiliated with Pilot Life and I have been assigned to service your account." An alternative version of the letter dated April 10, 1984, stated that "[o]ur Agency is presently in the process of auditing and updating our files on policyholders who bought policies from agents not associated with this Agency." The letters then solicited a response from the policyholder either to review the policy with the agent or to update the agency's file.

As a result of the mailing, Aiken and Ferris directly contacted at least two policyholders enrolled by Elwert. During these meetings, the policyholders inquired about Elwert and were told by the agents either that, to their knowledge, he was no longer with Pilot Life and that his whereabouts were unknown, or that they did not know whether Elwert was still selling insurance. New policies were sold to the two clients, although one client cancelled the new policy after contacting Elwert and learning that Elwert was still selling insurance and acting as a broker for Pilot Life. It appears that Elwert lost renewal commissions on both policies, although the amount of the commissions is not stated in the record.

Upon learning of the communications between the new Pilot Life agency and the clients he had enrolled, Elwert filed his lawsuit on May 21, 1984, and obtained a temporary restraining order against Pilot Life. Although DeBerry may have intended to terminate Elwert at the time he instructed Aiken and Ferris to send the letters to Elwert's clients, Elwert was not given written notice of termination of the broker's contract until May 18, 1984.

The five counts of the complaint at issue in this appeal[2] were resolved by the trial court's entry of summary judgment in all the defendants' favor. The court held that the first count of the complaint, which alleged tortious interference with Elwert's business relationships, was barred because, in the trial court's view, Elwert lacked a business relationship with the policyholders

---

**2.** Six counts remaining in Elwert's amended complaint and defendants' sole counterclaim were dismissed with prejudice by agreement of the parties.

independent of his role as an agent for Pilot Life. We do not agree with the trial court's assessment of the law in the context of this case.

Tortious interference with business relationships has been defined by Ohio courts to occur when a person without privilege induces or otherwise purposely causes a third party not to enter into or continue a business relationship or perform a contract with another. *Juhasz v. Quick Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235; *Pearse v. McDonald's Systems* (1975), 47 Ohio App.2d 20, 1 O.O.3d 164, 351 N.E.2d 788; *Reichman v. Drake* (1951), 89 Ohio App. 222, 45 O.O. 444, 100 N.E.2d 533. In support of its determination that Elwert, as a broker for Pilot Life, lacked a recognizable interest in the customers or their accounts, the trial court cited two cases, *Cutter v. Lincoln National Life Ins. Co.* (C.A.8, 1986), 794 F.2d 352, and *Furr Marketing, Inc. v. Orval Kent Food Co., Inc.* (S.D.Miss.1988), 682 F.Supp. 884, each involving a claim of tortious interference lodged by a broker against the broker's suppliers.

*Cutter* involved an action by a former life insurance agent who had become a broker, brought against the companies whose life insurance she sold. After she became a broker, defendants' agents contacted one of her clients and informed him that she had been terminated. One other client contacted the defendants' agent and allowed the agent to rewrite a policy written by the plaintiff. The court in *Cutter* held that "[t]here was no tortious interference here as a matter of law because there was no business relationship—contract or otherwise—which plaintiff had with the insureds which was independent of plaintiff's role as an agent for the defendant companies." *Cutter, supra,* at 356. The *Cutter* decision indicates, however, that when the plaintiff ceased being an agent and became a broker for the insurers, she "did not maintain the one-for-one vesting rights" to guaranteed renewal commissions she enjoyed as the companies' agent. She had also been paid all vested renewal commissions at the time her agency contract terminated.

In *Furr Marketing,* a broker of defendant's products sued when the defendant assigned other brokers to the plaintiff's customer accounts. The accounts were listed in the parties' nonexclusive brokerage contract. The court in *Furr Marketing* held that the broker was an agent employed by the defendant principal to make contracts on its behalf for a commission or fee, and thus the sales of the defendant's products by the broker were transactions between the customer and the defendant. The broker therefore was unable to establish any existing or prospective contractual relationships between it and its customers that could form the basis of a tortious interference claim. *Furr Marketing, supra,* at 886. No renewal commissions were at stake in *Furr Marketing,* however.

■ To the extent the broker's expectation of any renewal commissions was held to be unenforceable in *Cutter*, we decline to follow the reasoning of the Eighth Circuit Court of Appeals in this case. A number of courts have recognized that, under appropriate circumstances, an agent may have a cause of action against the principal for tortious interference with economic advantage, despite the existence of a principal-agent relationship. See *Bosarge v. Bankers Life Co.* (Ala.1989), 541 So.2d 499; *Preferred Risk Ins. Co. v. Boykin* (1985), 174 Ga.App. 269, 329 S.E.2d 900; 1 Harnett, Responsibilities of Insurance Agents and Brokers (1990 and Supp.) 7–77, Section 7.14; 43 American Jurisprudence 2d (1970) 150, Insurance. Whether an insurance agent or broker has a recognizable interest in renewal commissions depends upon the terms of the contract between the agent or broker and the company, to be construed according to the intent of the parties. See 43 American Jurisprudence 2d, *supra*, at 146; 57 Ohio Jurisprudence 3d (1985) 195, Insurance; Annotation, Insurance Agent's Right to Commissions on Renewal Premiums (1971), 36 A.L.R.3d 958. Ohio courts have recognized that once an insurance agent's right to a renewal commission is earned, it may not be circumvented by a later arrangement between the insurance company and the insured. *Michigan Auto Ins. Exchange v. Vaughan* (1923), 19 Ohio App. 149.

Other Ohio courts that have refused to allow claims of tortious interference with business relationships have done so on the grounds that the relationship sought to be protected was between only the defendant principal and the plaintiff agent, see *Plazzo v. Nationwide Insurance Co.* (Nov. 5, 1986), Summit App. No. 12528, unreported, 1986 WL 12543; that the defendant was privileged to protect its own business relationship with its clients, *id.; Barno v. Empire General Life Ins. Co.* (Nov. 10, 1983), Cuyahoga App. No. 46499, unreported, 1983 WL 2754; or that no evidence of the defendant's intent to interfere was presented, *Barno, supra.*

■ We hold in the instant case that genuine issues of material fact preclude judgment as a matter of law in Pilot Life's favor with respect to Elwert's claim of tortious interference with business advantage. The standard governing the disposition of the defendants' motion for summary judgment is set forth in Civ.R. 56, which provides that a party against whom a claim is asserted may move, with or without supporting affidavits, for summary judgment in his favor on all or any part of the claim. Civ.R. 56(A). A motion for summary judgment may be granted if the court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence and written stipulations of fact in a light most favorable to the party opposing the motion determines:

(1) that no genuine issue of material fact remains to be litigated;

(2) that the moving party is entitled to judgment as a matter of law; and

(3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267; Civ.R. 56(C).

The agency contract in question provides that termination after three years of continuous service vests the earned life renewal commissions in the agent. The agency contract does not designate the time or event upon which an agent's renewal commission is earned, however. The ambiguity is further enhanced by the terms of Elwert's brokerage contract, which provides that it "cancels all previous contracts or agreements between the Company and the Broker." As defendants argued below in their initial memorandum in support of summary judgment, the brokerage clause raises a question whether Elwert's right to vested renewal commissions was intended to survive the execution of the brokerage contract.[3]

■ The defendants attempted to show that Elwert violated one of the conditions necessary to maintaining his vested right to renewal commissions when he engaged in a pattern of replacing Pilot Life policies with the policies of its competitors. The trial court did not reach the issue because it disposed of the claim on the ground that Elwert lacked a recognizable business interest. We conclude that there is a genuine issue of material fact as to whether Elwert violated the contract terms by engaging in a pattern of selling additional, competing policies to Pilot Life policyholders who, in turn, cancelled their Pilot Life policies several weeks later. Elwert argued below that the competing policies were universal life insurance policies, a product not offered by Pilot Life at the time, and were therefore permissibly submitted to Pilot Life's competitors without first being offered to Pilot Life, because such policies were not actually competing with Pilot Life's products. Elwert then argued that the number of subsequent cancellations of Pilot Life policies was purely circumstantial and not the result of any intent or plan to replace Pilot Life policies with those of its competitors. The relative weight to be given to

---

**3.** The memorandum states:

"Plaintiff executed the new Broker Contract which cancelled the prior Agent's Career Contract and as a consequence he can not now maintain this suit for breach of the Agent's Career Contract. Upon the execution of a valid and legal substituted agreement, the agreement merges into it and is extinguished (but for the *vested* renewal commissions provided for in the Agent's Career Contract), and even failure to perform the substituted agreement will not revive the old agreement. *Spier v. Hyde,* 78 App.Div. 151, 79 N.Y.S. 699." (Emphasis *sic.*)

the parties' arguments remains, on the evidence in this record, to be decided by a trier of fact.

Further, we hold that the defendants are not entitled to summary judgment on the ground of privilege. Under the defense of privilege recognized in *Juhasz, supra,* and defined in the Restatement of the Law, Torts (1939), Section 766:

" 'One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction.' " *Juhasz, supra,* 55 Ohio App.2d at 57, 9 O.O.3d at 219, 379 N.E.2d at 239.

Factors that determine the existence of a privilege include:

" '(a) the nature of the actor's conduct,

" '(b) the nature of the expectancy with which his conduct interferes,

" '(c) the relations between the parties,

" '(d) the interest sought to be advanced by the actor, and

" '(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.' " *Id.*

It has also been noted that the Restatement of the Law 2d, Torts, would add consideration of an actor's motive to the list of factors. *Heheman v. E.W. Scripps Co.* (C.A.6, 1981), 661 F.2d 1115 (applying Ohio law).

The determination of the defendants' privilege to contact Elwert's policyholders involves genuine issues of material fact, including a determination of the nature of Pilot Life's conduct and whether DeBerry's instruction to Aiken and Ferris to contact the policyholders was wrongfully intended to inform the policyholders that Elwert was no longer authorized to write Pilot Life policies when, in fact, he was so authorized. The defense of privilege should not be extended to sanction falsehoods deliberately circulated to circumvent an agent's right to renewal commissions, if that is indeed the case in this instance. Elwert demonstrated that DeBerry was aware of his agency and brokerage contracts at the time he instructed Aiken and Ferris. On the state of this record, it cannot be determined, as a matter of law, whether such instructions were given with an intent to injure Elwert or were merely poorly timed with Elwert's notice of termination.

Finally, we hold there to be a genuine issue of material fact whether Pilot Life acted with the intent required to give rise to liability under Elwert's first claim. Although some courts have apparently required a showing of

actual malice to recover on a claim of intentional interference with business relations, this court has previously held that actual malice such as personal ill will, spite or hatred is not an essential element of the claim. *Reichman v. Drake* (1951), 89 Ohio App. 222, 45 O.O. 444, 100 N.E.2d 533. Instead, malice, as used in connection with this cause of action and in the absence of a showing of qualified privilege, denotes an unjustified interference with the contractual or business relationship. *Id.* at 228, 45 O.O. at 447, 100 N.E.2d at 537. See, also, *Province v. Cleveland Press Publishing Co.* (C.A.6, 1986), 787 F.2d 1047; *Heheman, supra.* Here, DeBerry's knowledge of the terms of Elwert's contracts and any of Elwert's rights to renewal commissions at the time he instructed Aiken and Ferris to contact the policyholders raises a genuine issue of material fact concerning Pilot Life's intent.

Because there exists a genuine issue of material fact as to each of the elements of Elwert's claim against Pilot Life for intentional interference with business relationships, the assignment of error is in part well taken.

■ With respect to Elwert's claim against the individual defendants, Billy Luttrell, Donald Ferris and Michael Aiken, however, Elwert offered nothing to controvert the evidence indicating that the agents were unaware that he remained authorized to sell Pilot Life insurance, or that he may have retained a vested interest in renewal commissions on the existing policies, at the time the statements were made. Because Elwert failed to demonstrate that there remained to be resolved at trial at least a genuine issue of material fact concerning the essential element of intent in his tortious interference claim against the agents, we hold that summary judgment was properly entered in their favor on that claim. *See Hodgkinson v. Dunlop Tire & Rubber Corp.* (1987), 38 Ohio App.3d 101, 526 N.E.2d 89.

Elwert's second and third assignments of error are premised on the trial court's denial of his claims of libel *per se* and slander *per se,* and are not well taken because the innocent construction rule of *Becker v. Toulmin* (1956), 165 Ohio St. 549, 60 O.O. 502, 138 N.E.2d 391, applies to the defamation claims.

■ A publication will be considered defamatory *per se* when it appears that the publication reflects upon the person's character by bringing him into ridicule, hatred or contempt, or affects him injuriously in his trade or profession. *Becker, supra.* When a publication is defamatory *per se* the defamed person is entitled to maintain an action without pleading or proving special damages. *Id.* Malice is presumed in such cases and damages are allowed for the effect of the defamation upon the person defamed. If the words in the publication are reasonably susceptible to an innocent construction and are not defamatory in themselves, they cannot constitute defamation *per se.* *Id.*

It is the sole function of the court to determine whether words constitute libel *per se,* where the words of a publication are not so ambiguous or uncertain as to their definition, and such a question is not for a trier of fact. *Id.* at paragraph one of the syllabus. The issue raised in this case concerns the definition of a term of the publication that Elwert was no longer "affiliated" with Pilot Life, made in the March 28, 1984 correspondence. We note that the term "affiliated" is defined by Webster's New Collegiate Dictionary (1981) 20, as "closely associated with another typically in a dependent or subordinate position," a definition which might reasonably be construed to have been accurately used to describe Elwert's broker status in the publication in question.

The record reflects that Pilot Life's agents understood the term "affiliated" to convey the meaning that Elwert no longer had any connection with Pilot Life. If the term "affiliated" is taken in the colloquial sense given it by Pilot Life's agents, the publication might tend to affect Elwert injuriously in his trade or profession by conveying to his customers the false idea that Elwert could no longer write Pilot Life insurance for them. The trial court determined that because the record did not reveal actual malice on Pilot Life's behalf, the defendants were entitled to summary judgment. As *Becker* makes clear, however, malice is inferred in defamation *per se* claims.

The ambiguous meaning of the term "affiliated" can be resolved in this instance by resort to the innocent construction rule of *Becker v. Toulmin.* The innocent connotation rule precludes a claim of defamation *per se* where a publication is innocent on its face but is claimed to be defamatory by innuendo. The rule then requires a party to prove the claim under the theory of libel *per quod,* and to plead and prove special damages. Elwert must rely on innuendo to show the unique understanding of the term "affiliated" held by the Pilot Life agents, and possibly the insureds in this case. Because a court may reasonably construe the communication to be innocent on its face, this case falls within the rule of *Becker.* Because Elwert has not pleaded defamation *per quod,* the claim based on the March 28 letter fails as a matter of law.

We also hold that the innocent construction rule applies to the April 10, 1984 correspondence that Elwert was an agent "not associated with this Agency." The letter contained the new agency's separate address and can reasonably be construed to contain an innocent meaning: that Elwert had a relationship with Pilot that was distinct from that of the new agency. We hold that summary judgment was properly granted in the defendants' favor with respect to that publication.

■ With respect to Elwert's claim for slander *per se*, based on the agents' statements that Elwert was no longer with Pilot Life, we hold that the defendants were entitled to judgment as a matter of law for the same reasons. The statements may reasonably be construed to mean that the agents lacked personal knowledge of Elwert's status, or that Elwert was not associated with the new Pilot Life office.

■ Elwert's fourth claim is that the defendants' communications to the insureds constituted unfair and deceptive trade practices in violation of R.C. 3901.21 and 3901.22. The trial court granted summary judgment, in this instance on the authority of *Strack v. Westfield Companies* (1986), 33 Ohio App.3d 336, 515 N.E.2d 1005. In *Strack*, the Court of Appeals for Summit County held that:

"[n]owhere in the Ohio statutory or regulatory framework proscribing deceptive trade practices in insurance does it provide a civil remedy to a private party aggrieved by an insurer. The Stracks urge this court to extrapolate such a remedy from those statutes and the regulation set out above. This court declines to do so." *Id.* at 337, 515 N.E.2d at 1007.

Elwert seeks to distinguish *Strack* on the ground that the case involved a claim made by an insured and not by a broker or agent, as in the instant case. We hold that the legislature, to the extent it meant to include an agent or broker such as Elwert as a member of the protected class, nevertheless did not intend to extend a private remedy to any member of that class.

We agree with the analysis in *Strack*, which applied a three-prong test adopted from *Cort v. Ash* (1975), 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, for determining when a private cause of action should be implied. Under the first prong of the test, the court in *Strack* assumed *arguendo* that the plaintiffs were members of the class to be protected by the legislation. The *Strack* court applied the second and third prongs of the test and concluded that there was no indication of legislative intent to create a remedy and that to imply such a remedy was inconsistent with the purposes of the legislative scheme. We hold *Strack* to be persuasive and indistinguishable from the instant facts. Elwert's fourth assignment of error is therefore overruled.

■ Elwert's fifth cause of action for punitive damages and attorney's fees can proceed only as a component of a tort claim. See *Davis v. Tunison* (1959), 168 Ohio St. 471, 7 O.O.2d 296, 155 N.E.2d 904. The trial court held that the failure of Elwert's first three claims precluded recovery under this claim. Because we have determined that the trial court erroneously entered summary judgment for Pilot Life on the first claim, we find Elwert's fifth assignment of error to be well taken in part.

The summary judgment entered in favor of Pilot Life on the first and fifth claim stated in the Elwerts' complaint is reversed, and this case is remanded to the trial court for further proceedings on those two claims only. In all other respects, the trial court's judgment is affirmed.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

SHANNON, P.J., DOAN and KLUSMEIER, JJ., concur.